2000 ND 151

**In the Matter of the ESTATE OF Greg SAGMILLER, Deceased.**

**Ford Motor Credit Company, Claimant and Appellant,**

v.

**Jeanette Sagmiller, Personal Representative of the Estate of Greg Sagmiller, deceased, Respondent and Appellee.**

**No. 20000055.**

Supreme Court of North Dakota.

Aug. 18, 2000.

Dennis W. Lindquist, Mandan, N.D., for claimant and appellant.

Thomas B. Bair, Bair, Bair & Garrity, LLP, Mandan, N.D., for respondent and appellee.

VANDE WALLE, Chief Justice.

[¶ 1] Ford Motor Credit Company ("FMCC") appealed from an order denying FMCC's claim against the Estate of Greg Sagmiller. We reverse and remand with directions to enter an order allowing the claim.

[¶ 2] In November 1998, Greg Sagmiller bought a 1999 Ford Ranger pickup from Bill Barth Ford/Mercury Motors of Mandan for $19,740.48. FMCC financed the sale in the amount of $18,595.45. Sagmiller died on April 12, 1999. On April 22, 1999, FMCC repossessed the vehicle. It sent a Notice of Repossession and Right to Redeem to Greg Sagmiller's last known address on April 23, 1999. Nineteen days later, on May 12, Ford sold the vehicle at a dealers-only auction, the Minneapolis Auto Auction, for $15,500. After applying the proceeds of the sale to the outstanding balance, FMCC petitioned the Estate to allow its claim and the claim was denied. Ford petitioned the court to allow the claim and asked for a hearing. After the hearing, the district court denied the claim because the pickup was not sold in a commercially reasonable manner.

[¶ 3] The district court cites two reasons for concluding FMCC did not meet its burden to demonstrate it acted in a commercially reasonable manner: 1) the manner of sale was a private, dealers-only auction; and 2) the price obtained at the auction. Regarding the manner of sale, the district court said:

FMCC explained it took all its repossessed vehicles to the auction. It said it could not do otherwise because it did not have a motor vehicle dealer[']s license. This does not explain why it could not have one of its customer dealers sell

vehicles on consignment at retail. Presumably a better price could be realized than at a dealers-only auction when the buyers are motivated to buy at the lowest price possible in order to be able to resell the vehicle for a profit.

[¶ 4] Regarding the price obtained for the pickup, the district court said:

Here, the balance owed on the truck at the time of the sale was $18,506.70. FMCC's own internal document says the wholesale value of the truck was $22,150. No evidence of retail value was submitted at trial, but it is reasonable to assume the retail value would exceed the wholesale value. Interestingly, FMCC presented no evidence of value. The truck was sold at auction for $15,500. The evidence viewed most favorably to FMCC is that the auction price and the fair market value of the truck differed by more than $2,000.

I

[¶ 5] Section 41–09–50(3), N.D.C.C., requires every aspect of a disposition, "including the method, manner, time, place, and terms" to be commercially reasonable. The secured creditor has the burden of proof to show the commercial reasonableness of the disposition of collateral where commercial reasonableness is challenged and the secured party seeks a deficiency judgment. *Am. State Bank of Killdeer v. Hewson*, 411 N.W.2d 57, 61 (N.D.1987). Once the secured party makes a prima facie case indicating the collateral was sold in a commercially reasonable manner, the burden of persuasion, not the burden of proof, shifts to the debtor to elicit specific evidence of commercial unreasonableness. *Id.*

[¶ 6] Whether or not a sale of collateral was conducted in a commercially reasonable manner is essentially a factual question. *Id.* at 60. A finding of fact will not be set aside unless it is clearly erroneous. N.D.R.Civ.P. 52(a). A finding of fact is clearly erroneous if it is induced by an erroneous conception of the law, if there is

no evidence to support it, or if, although there is some evidence to support it, on the entire record, a reviewing court is left with a definite and firm conviction a mistake has been made. *Kaler v. Kraemer*, 1999 ND 237, ¶ 18, 603 N.W.2d 698.

[¶ 7] A primary reason the district court found the sale was not commercially reasonable was the price the automobile garnered at auction. Sagmiller cites, as did the district court, the fact one of FMCC's documents states the wholesale value of the pickup was $22,150. The document was provided to FMCC by the Minneapolis Auto Auction, but there was no testimony as to how this number was calculated. A different FMCC document suggests wholesale value was $16,509.

[¶ 8] We have stated before the disparity between price received at auction and the estimated value of the collateral is an important factor, but is not dispositive in determining whether collateral was sold in a commercially reasonable manner. *Hewson*, 411 N.W.2d at 64–65. Section 41–09–53(2), N.D.C.C., states:

The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner.

[¶ 9] The price obtained here is not enough to demonstrate the sale was not commercially reasonable. Thus, we turn to the other reason the district court gave for finding the sale to be commercially unreasonable.

[¶ 10] Another reason the district court cited in finding the sale commercially unreasonable was the fact the collateral was sold at a dealers-only auction in Minneapolis. A witness from FMCC testified it is FMCC's practice to take all repossessed vehicles to the Minneapolis Auto Auction. Courts in several jurisdictions, under many contexts, have held dealers-only auctions may constitute commercially reasonable sales. See Chrysler Credit Corp. v. B.J.M., Jr., Inc., 834 F.Supp. 813, 837 (E.D.Penn.1993) (holding sale of dealer's inventory at dealers-only auction was commercially reasonable and did not prevent floor plan financier from seeking deficiency judgment); Ford Motor Credit Co. v. Mathis, 660 So.2d 1273, 1277 (Miss.1995) (holding disposition of debtor's automobile at dealers-only auction was not per se commercially unreasonable and reversing and remanding for evaluation based on factors such as manner, method, time, place and terms of sale); Garden Nat'l Bank of Garden City v. Cada, 241 Kan. 494, 738 P.2d 429, 432 (1987) (concluding sale of collateral at automobile auction in which participation was limited to dealers was a private sale and commercially reasonable); Ford Motor Credit Co. v. Russell, 519 N.W.2d 460, 465–66 (Minn.App. 1994) (holding sale of collateral at auction for wholesale dealers was presumed to be commercially reasonable); Beard v. Ford Motor Credit Co., 41 Ark.App. 174, 850 S.W.2d 23, 28–29 (1993) (concluding dealers-only auction was "private sale" within Uniform Commercial Code and such sale was commercially reasonable); Union Nat'l Bank of Wichita v. Schmitz, 18 Kan. App.2d 403, 853 P.2d 1180, 1187 (1993) (reversing the trial court and concluding a dealers-only auction was a commercially reasonable manner of disposing of automobile in this case); Calcote v. Citizens & Southern Nat'l Bank, 179 Ga.App. 132, 345 S.E.2d 616, 619 (1986) (holding evidence supported finding sale of automobile at auction held for dealers only was commercially reasonable).[1]

[¶ 11] The Estate of Sagmiller criticizes the wholesale disposition of the collateral here because, it argues, the pickup could have garnered a higher price at a retail sale.[2] A dealers-only auction is considered a private sale, see, e.g., Beard, 850 S.W.2d at 28–29, and private sales are approved under the Uniform Commercial Code. See N.D.C.C. § 41–09–50(3) (stating "[d]isposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts").

[¶ 12] Moreover, retail dispositions are not necessarily superior to wholesale dispositions. The Kansas Supreme Court stated in discussing the question of wholesale versus retail disposition of goods:

> In many cases, a retail sale of the goods will command a much higher price; how-

---

**1.** Many of the cases cited consider whether a dealers-only auction is a public or private sale because notice requirements are less stringent for a private sale than a public sale. See N.D.C.C. § 41–09–50(3) (stating "Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor...."). Most courts have concluded a dealers-only auction is a private sale. See, e.g., Garden Nat'l Bank of Garden City v. Cada, 241 Kan. 494, 738 P.2d 429, 432 (1987).

At the district court, the Estate of Sagmiller challenged whether FMCC properly complied with notice provisions. On appeal, the Estate has not challenged the sufficiency of notice and our review of the record indicates FMCC properly complied with the Code's notice requirements. See N.D.C.C. § 41–09–50(3).

**2.** The Estate of Sagmiller argued FMCC "dumped" the repossessed vehicle quickly without trying to get a reasonable price for it. As part of this argument, the Estate claimed the vehicle was sold on May 3, 1999, shortly after it was repossessed on April 22, 1999. After a review of the record, it appears May 3, 1999 was the legal sale date, that is the earliest date the pickup could have been sold. The pickup was not actually sold, however, until May 12, 1999.

ever, a retail sale may involve more expenses and usually will take much longer to conclude. This in turn may not be reasonably feasible in view of higher storage expense and higher interest accumulation on the obligation. In some cases, a sale to a dealer on the wholesale market may be the more reasonable approach. Sales to a dealer seem to be suggested under § 9–504 and the official comments under that section and also in the official comment to § 9–507(2) which suggests that sale of repossessed collateral through a dealer may be the better method in the long run since the secured party does not usually maintain his own facilities for making such sales. The answer to the question whether a sale on the retail or wholesale market is commercially reasonable must generally depend upon the circumstances of each particular case and, therefore, is a question of fact for the factfinder to determine.

*Westgate State Bank v. Clark*, 231 Kan. 81, 642 P.2d 961, 970 (1982).

[¶ 13] *Schmitz*, 853 P.2d 1180, a case out of Kansas, is particularly persuasive because of its similarity to the case at bar. Schmitz purchased a used automobile for $4,662.40, borrowing the money from Union National Bank of Wichita. He defaulted on the loan and voluntarily surrendered the vehicle to the Bank. The Bank sold the vehicle at a dealers-only auction for $920, minus a $75 sale fee. The Bank sought recovery of the deficiency amount of $2,087.97.

[¶ 14] The trial court held the creditor had not sustained its burden of proof to show the sale was commercially reasonable. The Kansas Court of Appeals reversed stating:

> The method utilized to dispose of the collateral in this case was a well-known, regularly scheduled, dealer-only wholesale auction. The trial court's findings that this sale was commercially unreasonable are so broad that they virtually declare any dealers-only wholesale auc-

tion to be not commercially reasonable. In deciding this issue, the trial court focused solely on the nature of the auction and the price received for the vehicle. The trial court's decision, if allowed to stand, would mean that a dealer-only wholesale auction could not be commercially reasonable. This is not the law, and the trial court erred in reaching this conclusion.

*Id.* at 1184.

■ [¶ 15] The district court here stated, "Presumably a better price could be realized than at a dealers-only auction when the buyers are motivated to buy at the lowest price possible in order to be able to resell the vehicle for a profit." With our discussion of retail versus wholesale dispositions in mind, it may not be presumed, without evidence, a retail disposition is superior to a wholesale dealers-only disposition. Furthermore, speculation on whether a different mode of sale may have brought a better price does not support a finding of commercial unreasonableness. *See* N.D.C.C. § 41–09–53(2) (stating "[t]he fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner").

■ [¶ 16] We agree with the *Schmitz* court that such a holding would render dealers-only auctions (and possibly all wholesale auctions) commercially unreasonable per se. Any time collateral is sold at wholesale and there is a deficiency, the debtor can claim the secured creditor should have gotten a better price. This, however, does not demonstrate the collateral was sold in a commercially unreasonable manner. *See* N.D.C.C. § 41–09–53(2). While we do not hold that dealers-only auctions are commercially reasonable per se, neither are they commercially unreasonable per se.

[¶ 17] *Hewson,* a decision of this Court, was cited by Sagmiller's Estate and relied upon by the district court. In October 1984, Hewson purchased a tractor with dozer for the sum of $40,000 borrowed from American State Bank of Killdeer. Hewson defaulted and voluntarily surrendered the tractor with dozer in November 1985. The bank sold the tractor at public auction to the highest bidder for $8,700 and thereafter sought a deficiency for the remaining amount. The district court granted the Bank's motion for summary judgment, concluding the tractor with dozer was sold in a commercially reasonable manner.

[¶ 18] This Court reversed and remanded, concluding whether the tractor with dozer was sold in a commercially reasonable manner presented a genuine issue of material fact that precluded summary judgment. We noted the disparity between the price received at the auction and the fair market value of the machinery as stated by the debtor. We also considered Hewson's affidavit, in which he attested:

Rather than selling the tractor in the normal method and manner of disposing of farm equipment, the tractor was sold along with a bunch of boats and used snowmobiles. Attached to this Affidavit as Exhibit 'B' is a copy of an advertisement of the auction sale. The advertisement shows and reveals that:

1. The tractor was the only piece of farm equipment offered for sale.

2. All of the remaining property was recreational property.

3. The sale was held in a cold, unheated building in the middle of winter at 6:30 p.m.

4. Much of the property was old.

*Id.* at 64.

[¶ 19] We said the disparity in price, "taken in connection with Hewson's other statements in his affidavit which are supported by the newspaper advertisement, raises an issue of fact which should have been submitted to a jury rather than being decided by the court as a matter of law." *Id.* at 65.

[¶ 20] One obvious distinction between this case and *Hewson* is procedural. While in *Hewson,* the trial court determined commercial reasonableness as a matter of law, without a trial, here the district court held an evidentiary hearing and determined commercial reasonableness as the trier-of-fact. Moreover, the facts of this case, determined after evidentiary hearing and not on summary judgment, distinguish it from the alleged facts in *Hewson.*

[¶ 21] The disparity between the price received and the claimed fair market value is not as great here as it was in *Hewson.* Secondly, in *Hewson* the creditor allegedly sold the tractor with equipment unlike the tractor, while here the creditor sold the collateral with like equipment, automobiles at the Minneapolis Auto Auction. Unlike *Hewson,* the sale here was targeted to the people who would know the value of the collateral and would have an interest in purchasing it. Finally, in this case there has been no accusation regarding any deficiencies in the specific sale itself, as there was in *Hewson.*

[¶ 22] Importantly, the focus in *Hewson* was on all aspects of the sale, not merely on whether the sale was a public or private auction, or whether the price garnered was at or below market value.

[¶ 23] We recognize commercial reasonableness is determined on a case-by-case basis and generally depends on the aggregate circumstances of the sale, *see Lindberg v. Williston Indus. Supply Corp.,* 411 N.W.2d 368, 374 (N.D.1987), with the secured creditor having the burden of proof. *Hewson,* 411 N.W.2d at 61. We also recognize deference is to be given to the findings of the trial court. *In re Z.R.,* 1999 ND 214, ¶ 11, 602 N.W.2d 723. Here, however, the district court's narrow rationale relies on an unsupported presumption and, if allowed to stand, would broadly limit a creditor's options. Because

the evidence does not support a finding of commercial unreasonableness, we turn to the issue of whether the sale was conducted in a commercially reasonable manner.

## II

[¶ 24] A creditor is to demonstrate every aspect of a disposition is commercially reasonable, including "the method, manner, time, place and terms." N.D.C.C. § 41–09–50. FMCC could have better targeted its evidence to these specific factors. Nevertheless, the uncontradicted testimony of FMCC's witness is sufficient to demonstrate the collateral was sold in a commercially reasonable manner.

[¶ 25] The only witness who testified at the hearing was Aaron Robbins, an account manager for FMCC. Robbins said it was FMCC's practice to bring all of its repossessed cars to auctions. He testified he specifically uses the Minneapolis Auto Auction. Robbins, who said he has provided estimates for the value of "hundreds" of vehicles, testified he thought $15,500 was a reasonable price for the pickup. He also testified the fact the pickup's color was orange would have a negative effect on its value. Robbins said there was an FMCC representative at the auction who had authority to reject an auction price received if she did not think it was equivalent to the pickup's worth. The representative did not object to the price the pickup sold for.

[¶ 26] When asked why FMCC did not sell cars at dealerships for retail prices, Robbins said FMCC isn't licensed to sell vehicles themselves. When asked why FMCC did not get licensed, Robbins said, "It wouldn't make a difference even if we did that—even if it was done that way, if you add in the commission costs that are associated with it. Ford Credit would get a higher price just bringing it to an auction—or the Minneapolis auction in our area." Robbins' testimony was challenged on cross-examination:

Q All right. Thank you. Just one more point Mr. Robbins, you said that one of the reasons that you don't try to sell them on retail and you take them to auction is if you sold them at retail, you'd have to pay commissions and things like that, is that what your testimony was?

A Well Ford Credit isn't licensed to sell them anywhere but at auction.

Q Okay but you could sell them at retail somehow, couldn't you, through consignment or some other arrangement?

A No.

Q You couldn't, huh? Could you get a retail license if you wanted to?

A I suppose. I'm not even sure, I would just be speculating.

Q Okay but I guess what I'm getting at is if you really wanted to sell this at retail or try to sell it at retail, Ford Motor could do that, couldn't it?

A No.

Q You have a dealer network, don't you?

A A dealership might be able to sell their vehicles on their lot for retail but Ford Credit is not a dealership.

Q Yeah, but you work with all the dealers in the State of North Dakota, right?

A I work with them on a business relationship for them to send contracts to Ford Motor Credit, not vehicles.

Q Don't you think one of them would sell it on a—after you repoed it, don't you think one of them would put it on their lot and try to sell it retail for you if you asked them to?

A No.

[¶ 27] Robbins' testimony was uncontradicted. While the trial court determines the credibility of witnesses, *Wallwork Lease & Rental Co., Inc. v. Schermerhorn*, 398 N.W.2d 127, 131 (N.D.1986), here the trial court rejected the testimony and relied on an unsupported presumption that a retail sale would bring a better price.

That assumption is not warranted by the facts or the law. *See Schmitz,* 853 P.2d at 1186 (concluding based upon the statutes and opinions cited "the mere fact collateral is sold at wholesale and not 'exposed to the retail market' is not in and of itself sufficient to render a sale commercially unreasonable").

[¶ 28] The uncontradicted testimony of Robbins is sufficient to sustain FMCC's burden to prove the collateral was sold in a commercially reasonable manner. The evidence not only supports a commercially reasonable sale, but there is little or no evidence to the contrary. The fact the pickup could have brought a higher price at a different sale or on a different day is not sufficient to overcome the evidence of commercial reasonableness. The Estate of Sagmiller has adduced no specific evidence of commercial unreasonableness, short of evidence of the price. *See Hewson,* 411 N.W.2d at 61 (concluding once the secured party makes a prima facie case indicating the collateral was sold in a commercially reasonable manner, the burden of persuasion, not the burden of proof, shifts to the debtor to elicit specific evidence of commercial unreasonableness).

[¶ 29] The district court's finding of commercial unreasonableness is clearly erroneous because it was based on a presumption not supported by the law or the facts. We reverse that decision and remand with instructions to enter an order allowing FMCC's claim against the Estate of Sagmiller.

[¶ 30] DALE V. SANDSTROM, WILLIAM A. NEUMANN, MARY MUEHLEN MARING, CAROL RONNING KAPSNER, JJ., concur.