2009 ND 124

Virginia BICE, Helen A. and Hillis J. Bice, Helen A. Bice Life Estate, Naomi Brew, Patricia Burian Ingman, Myran S. and Mary C. Burian, Estate of Steve Burian, Arnold and Sharon Burian, Connie F. Burian Heck, Jane Elizabeth Kiker, Elmer L. Glovatsky, Timothy Glovatsky, Shirley and Lawrence W. Jablonsky, Leo and Selina Kaiser, Russell L. Kiker, Russell L. Kiker Trust, Sally A. Kiker Trust, Ardyce Burian Palaniuk, Irene E. Scott Mineral Trust, Jane Scott, William D. and Agnes M. Scott, Ervin and Mildred Waldie, Gregory Lynn Waldie, Mary M. Weber, Martin A. Weber, Jer-

ry Zabalotny, William D. Walters, Jr., Imperial Oil Company c/o William D. Walters, Jr., Lillian Hardcastle a/k/a Lillian Kaiser, Robert T. Smith, Carrie W. Smith, Plaintiffs and Appellants

v.

PETRO–HUNT, L.L.C., J.W. Beavers, Jr., as Trustee of William Herbert Hunt Trust Estate, Defendants and Appellees.

No. 20080265.

Supreme Court of North Dakota.

July 9, 2009.

**498**

Owen L. Anderson (argued), Norman, OK; Ronald H. McLean (on brief) and Jane L. Dynes (appeared), Serkland Law Firm, Fargo, ND; Marvin L. Kaiser (on brief), Kaiser Law Firm, Williston, ND; Michael J. Maus (appeared), Hardy, Maus & Nordsven, P.C., Dickinson, ND, for plaintiffs and appellants.

John W. Morrison, Jr. (argued), Crowley Fleck PLLP, Bismarck, ND, for defendants and appellees.

Debra L. Hoffarth (on brief), Pringle & Herigstad, Minot, ND, amicus curiae.

CROTHERS, Justice.

[¶ 1] Plaintiffs, proceeding as a class, appeal from the district court's order granting Petro–Hunt, L.L.C., summary judgment. We affirm, concluding the district court did not err in granting Petro–Hunt summary judgment.

I

[¶ 2] The Little Knife Field was discovered in 1976 by Gulf Oil Corporation ("Gulf"). In the late 1970s, Gulf built the Little Knife Gas Plant to process the sour casinghead gas produced from the Little Knife wells. The Little Knife Gas Plant removes hydrogen sulfide and liquid hydrocarbons from the casinghead gas; the residue gas and other plant products are then sold at or downstream of the plant tailgate. In the early 1980s, a dispute regarding how to value the gas for royalty purposes arose between Gulf and a number of royalty owners. In 1983, the parties entered a settlement agreement which incorporated by reference a separate agreement between Gulf and the North Dakota Tax Commissioner regarding the value of gas for tax purposes. The 1983 settlement agreement stated the royalty for the casinghead gas would be determined by adding all of the sources of revenue from the sale of gas and gas products

and subtracting from that total certain costs associated with processing the gas.

[¶ 3] As Gulf's successor by merger, Chevron acquired the Little Knife Gas Plant and its interests in the Little Knife Field in 1985. Chevron sold the Little Knife Gas Plant and its interests in the Little Knife Field to the William Herbert Hunt Trust Estate in 1992. The William Herbert Hunt Trust Estate conveyed its interests in the Little Knife Gas Plant and the Little Knife Field to Petro–Hunt, L.L.C., in 1997.

[¶ 4] Since acquiring its interest in the Little Knife Gas Plant and the Little Knife Field, Petro–Hunt has paid royalty on the casinghead gas on the same basis to each royalty owner regardless of the royalty clause in each owner's lease. The royalty clauses in each royalty owner's lease are not identical, but it is undisputed that the gas royalty clauses are substantially similar and call for gas royalty payments to be calculated based on the market value of the gas at the well.

[¶ 5] In 2001, royalty owners brought suit against Petro–Hunt asserting that underpaid royalties are due to them because Petro–Hunt deducts post-wellhead costs incurred to render the gas marketable. The royalty owners were certified as a Class in 2004. *See Bice v. Petro–Hunt, L.L.C.,* 2004 ND 113, 681 N.W.2d 74. The Class is defined as "[a]ll persons who own, or have owned, any minerals and/or royalty interests or overriding royalty interests located within the Little Knife Field of Dunn, Billings and McKenzie Counties of North Dakota from which gas was processed at the Little Knife Gas Plant."

[¶ 6] In February 2007, Petro–Hunt moved for summary judgment, and the Class also requested partial summary judgment in its favor. On April 30, 2007, the district court granted Petro–Hunt partial summary judgment, determining royalties should be calculated based upon the

work-back method. The district court stated that "[b]ecause the gas here has no discernible market value at the well, commercially reasonable processing costs can be deducted before royalties are calculated." The district court refused to rule on the remaining issues because discovery was not complete. After discovery was completed, Petro–Hunt again moved for summary judgment. In July 2008, the district court granted Petro–Hunt summary judgment on the remaining issues.

## II

[¶ 7] The Class argues the district court erred as a matter of law in granting Petro–Hunt summary judgment. "Summary judgment is appropriate when either party is entitled to judgment as a matter of law, and no dispute exists as to either the material facts or the inferences to be drawn from undisputed facts, or resolving the factual disputes would not alter the result." *Ward v. Bullis,* 2008 ND 80, ¶ 14, 748 N.W.2d 397. "Whether a grant of summary judgment was proper is a question of law reviewed de novo by this Court." *Red River Wings, Inc. v. Hoot, Inc.,* 2008 ND 117, ¶ 16, 751 N.W.2d 206. The party seeking summary judgment has the burden of "showing there is no genuine dispute regarding the existence of a material fact." *Buchholz v. Barnes County Water Bd.,* 2008 ND 158, ¶ 15, 755 N.W.2d 472. We have stated that:

"The party opposing the [summary judgment] motion, however, may not simply rely upon the pleadings or upon unsupported, conclusory allegations. Rather, the party resisting the motion must set forth specific facts by presenting competent, admissible evidence, whether by affidavit or by directing the court to relevant evidence in the record, demonstrating a genuine issue of material fact."

*Id.* (internal citations omitted). "On appeal, the evidence must be viewed in the light most favorable to the opposing party, and that party must be given the benefit of all favorable inferences." *Hurt v. Freeland,* 1999 ND 12, ¶ 7, 589 N.W.2d 551.

## A

[¶ 8] Gas obtained from the Little Knife Field is sour gas which contains hydrogen sulfide and other liquid hydrocarbons. To make the sour gas into sweet gas, which is a usable marketable product, the hydrogen sulfide is extracted from the sour gas. The Little Knife Gas Plant extracts the hydrogen sulfide from the sour gas, and the residue gas and other plant products are sold at or downstream from the tailgate of the Little Knife Gas Plant. Petro–Hunt asserts it can deduct the expenses incurred to make the sour gas marketable sweet gas before calculating the royalty due to the Class because the leases require it to pay royalty on the "market value [of the gas] at the well."

[¶ 9] The district court agreed with Petro–Hunt and granted its motion for summary judgment. In determining summary judgment was appropriate, the district court stated that in North Dakota the work-back method is used to calculate royalties when the lease states the royalties should be based upon the market value of the gas at the well. The court continued by saying that "[i]n accordance with … [the work-back] method royalties should be based on the fair market value of the gas at the time of production and should be calculated after processing costs have been deducted from gross sales revenues."

[¶ 10] The Class argues the court erred as a matter of law in determining post-production costs could be deducted before royalties are calculated. The Class asks this Court to adopt the first marketable product rule, requiring Petro–Hunt to incur the costs to make the casinghead gas marketable. The Class claims the lease language "market value at the well" supports an adoption of the first marketable product rule because the casinghead gas produced at the wells is not marketable until after it is processed. Thus, the Class argues the logical interpretation of the lease language is to pay royalty on the market value of the gas after it has been made marketable.

[¶ 11] "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible." N.D.C.C. § 9–07–04. A contract must be construed as a whole to give effect to each provision if reasonably practicable. N.D.C.C. § 9–07–06. "The words of a contract are to be understood in their ordinary and popular sense rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." N.D.C.C. § 9–07–09.

[¶ 12] Both parties argue the term "market value at the well" is not ambiguous. However, the Class claims that if we do not accept their interpretation of the term "market value at the well," then the term is ambiguous. We have stated the terms of the lease, the nature of the claimed deductible items and the type of royalty determine whether post-production costs are deductible prior to calculating the royalty. *West v. Alpar Res., Inc.,* 298 N.W.2d 484, 490 (N.D.1980) (citation omitted).

[¶ 13] The major treatises on oil and gas law demonstrate the unsettled nature of the law concerning the interpretation of the term "market value at the well." Currently, the majority of states interpret the term "market value at the well" to mean royalty is calculated based on the value of the gas at the wellhead. Byron C. Keeling & Karolyn King Gillespie, *The First Marketable Product Doctrine: Just What is*

*the Product?*, 37 St. Mary's L.J. 1, 51 (2005); Edward B. Poitevent, II, *Post–Production Deductions from Royalty*, 44 S. Tex. L.Rev. 709, 716 (2003); Brian S. Wheeler, *Deducting Post–Production Costs When Calculating Royalty: What Does The Lease Provide?*, 8 Appalachian J.L. 1, 7 (2008). This interpretation is commonly referred to as the "at the well" rule. Wheeler, *supra*, at 7. According to the "at the well" rule, "any costs incurred by the lessee after the [gas] reaches the wellhead, whether to improve the quality of the [gas] or to transport it to a market where it may be sold may be" deducted before the royalty is calculated. Poitevent, *supra*, at 716; Wheeler, *supra*, at 7.

[¶ 14] States that follow the "at the well" rule allow a lessee to use one of two methods to calculate the gas or oil's market value at the well. Keeling, *supra*, at 32. A lessee may use the comparable sales method where the lessee determines the market value of the gas at the wellhead "by averaging the prices that the lessee and other producers are receiving, at the same time and in the same field, for oil or gas of comparable quality, quantity, and availability." *Id.* at 31–32. The other method a lessee could use to determine the market value of oil or gas is the work-back or netback method. *Id.* at 32. Under the work-back method the lessee calculates the market value of the gas at the well "by taking the sales price that it received for its oil or gas production at a downstream point of sale and then subtracting the reasonable post-production costs (including transportation, gathering, compression, processing, treating, and marketing costs) that the lessee incurred after extracting the oil or gas from the ground." *Id.* Most courts prefer the comparable sales method. *Id.* at 33. However, the comparable sales method cannot be used if there is no evidence of comparable sales either because adequate records are unavailable or

because the gas is not saleable at the wellhead. *Id.*

[¶ 15] As previously stated, the "at the well" rule, allowing a lessee to deduct post-production costs prior to calculating royalty, is the majority rule. Keeling, *supra*, at 51; Poitevent, *supra*, at 716; Wheeler, *supra*, at 7. The three major oil and gas producing states, Louisiana, Mississippi and Texas follow the "at the well" rule. *Babin v. First Energy Corp.*, 96 1232, p. 2 (La.App. 1 Cir. 3/27/97); 693 So.2d 813, 815; *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 122 (Tex.1996); *Piney Woods Country Life Sch. v. Shell Oil Co.*, 726 F.2d 225 (5th Cir.1984) (interpreting Mississippi law). Other states also following the "at the well" rule include California, Kentucky, Montana and New Mexico. *Elliott Indus. Ltd. P'ship v. BP America Prod. Co.*, 407 F.3d 1091, 1109–10 (C.A.10, 2005); *Atlantic Richfield Co. v. State*, 214 Cal.App.3d 533, 262 Cal.Rptr. 683, 688 (1989); *Montana Power Co. v. Kravik*, 179 Mont. 87, 586 P.2d 298, 303 (1978); *Reed v. Hackworth*, 287 S.W.2d 912, 913 (Ky.1956).

[¶ 16] A minority of states have expressly rejected the "at the well" rule and have adopted the first marketable product doctrine. Keeling, *supra*, at 51; Poitevent, *supra*, at 717; Wheeler, *supra*, at 8–9. The Class has requested that we adopt the first marketable product doctrine. The first marketable product doctrine requires the lessee to pay any costs incurred in turning the unmarketable gas into a marketable product. Poitevent, *supra*, at 717; Wheeler, *supra*, at 8–9. Once the gas is marketable, additional costs incurred to enhance the products marketability are shared between the lessee and the lessor. Wheeler, *supra*, at 9. Presently, Arkansas, Colorado, Oklahoma, Kansas and West Virginia have adopted the first marketable product doctrine. Keeling, *supra*, at 51; Wheeler, *supra*, at 10.

[¶ 17] The problem that has emerged with the first marketable product doctrine is the difficulty in determining when the gas has become a marketable product. Wheeler, *supra,* at 10. This problem is "highlighted by the fact that even the states which follow the [first] 'marketable product' rule have failed to articulate a clear standard for determining when a marketable product has been created." Wheeler, *supra,* at 24.

[¶ 18] We have not explicitly defined how a royalty should be calculated when based upon "market value at the well." However, in two cases involving the North Dakota Tax Commissioner's assessment of oil and gas taxes, we held that the State Tax Commissioner could calculate the fair market value of the oil and gas for tax purposes by deducting processing costs from the gross sales revenues using the work-back method. *Koch Oil Co. v. Hanson,* 536 N.W.2d 702, 707–08 (N.D.1995); *Amerada Hess Corp. v. Conrad,* 410 N.W.2d 124, 127 n. 3, 130 (N.D.1987).

[¶ 19] In a similar royalty dispute where the royalty owners argued the lessee could not deduct processing costs prior to calculating royalties, the Eighth Circuit interpreting North Dakota law stated the market value at the well is calculated in North Dakota by "deducting processing costs from gross sales revenues." *Hurinenko v. Chevron, USA, Inc.,* 69 F.3d 283, 285 (8th Cir.1995). The court continued by saying that the work-back method was particularly appropriate here because the gas did not have a "readily discernible market value at the well before the incursion of processing costs to separate the compounds." *Id.* We have held, "A federal district court decision interpreting North Dakota law is not binding upon North Dakota courts. We will, however, respect a federal district court opinion if it is persuasive and based upon sound reasoning."

*Scheer v. Altru Health Sys.,* 2007 ND 104, ¶ 16, 734 N.W.2d 778 (citations omitted).

[¶ 20] The facts of *Hurinenko* are similar to this case, and, we find the Eighth Circuit's interpretation of market value at the well persuasive. Like the field in *Hurinenko,* the Little Knife Field produces sour gas with no discernible market value at the well before it is processed and the hydrogen sulfide and liquid hydrocarbons are removed. Since the contracted for royalty is based on the market value of the gas at the well and the gas has no market value at the well, the only way to determine the market value of the gas at the well is to work back from where a market value exists, meaning using the work-back method, by deducting post-production costs from the plant tailgate proceeds. Petro–Hunt cannot use the comparable sales method to calculate the royalty because, at least under the facts in this case, no comparable sales exist since the gas is not saleable at the wellhead.

[¶ 21] We conclude the term market value at the well is not ambiguous. We join the majority of states adopting the "at the well" rule and rejecting the first marketable product doctrine. Thus, we conclude the district court properly determined Petro–Hunt can deduct post-production costs from the plant tailgate proceeds prior to calculating royalty. We affirm the district court's order granting Petro–Hunt summary judgment regarding the use of the work-back method to calculate royalties.

B

[¶ 22] The Class argues the district court erred as a matter of law by granting Petro–Hunt summary judgment, after determining Petro–Hunt could use residue gas off of the leased premises without paying royalty on that gas. Each of the leases in question contains a "free

use" clause. The leases state either the lessees "shall have the right to use, free of cost, gas, oil and water produced on said land for its operation thereon" or the lessees "shall have free use of oil, gas and water from said land ... for all its operations hereunder." Petro–Hunt has three main central tank batteries. After the gas is pumped to the surface it goes to one of the central tank batteries where the gas, oil and water are separated. Those separate streams of oil, gas and water are then sent to the Little Knife Gas Plant where the sour gas is processed to make it marketable and the other products are extracted. The gas and other products, like sulfur and butane, then are sold at the plant tailgate. The record indicates Petro–Hunt takes residue gas already processed at the Little Knife Gas Plant and uses it as fuel at the central tank batteries to heat, treat, and separate the oil, gas and water into separate streams.

[¶ 23] The Class claims Petro–Hunt must pay royalty on the residue gas used at the central tank batteries because it is using the gas off of the leased premises. The Class contends the lease's "free use" clause only allows Petro–Hunt to use gas free of cost if it is used on the leased premises. Petro–Hunt argues the "free use" clause allows it to use the gas off of the leased premises without paying royalty on that gas as long as the gas is used in furtherance of the lease operations. Petro–Hunt claims the gas used at the central tank batteries is in furtherance of the lease operations because it is used to fuel heaters, treators, and separators which are all essential functions in making the casinghead gas marketable.

[¶ 24] Both parties agreed that the district court could decide as a matter of law whether Petro–Hunt could use residue gas off of the leased premises free of cost. In determining Petro–Hunt was entitled to use residue gas off of the leased premises

without paying royalty on it, the district court stated that "the words 'thereon' or 'hereunder' modify the word 'operations' and are not limitations on where the physical consumption of the gas may occur." The district court stated the narrow construction offered by the Class, allowing free use of gas used on the leased premises, could lead to absurd results because one lessor may be required to bear the entire burden of the "free use" clause if its land contains one of the central tank batteries.

[¶ 25] "The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity." N.D.C.C. § 9–07–02. "The words of a contract are to be understood in their ordinary and popular sense rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." N.D.C.C. § 9–07–09.

[¶ 26] Whether residue gas can be used off of the leased premises, but in furtherance of the lease operations without paying royalty on that gas under a "free use" clause is an issue of first impression. The record indicates the functions performed by the central tank batteries are the same functions normally performed at individual well sites. Instead of having a battery at each well site, Petro–Hunt consolidated these facilities into three central tank batteries. The record demonstrates the use of the central tank batteries benefits both Petro–Hunt and the Class. The central tank batteries are beneficial to both the Class and Petro–Hunt because they are more efficient resulting in less overall use of lease gas, minimize surface disturbance and allow hydrocarbons to be recovered from gas on which the lessors receive royalties.

[¶ 27] Interpreting the "free use" clause to only allow Petro–Hunt to use residue gas on the leased premises could lead to an absurd result because it would require lessors who have a central tank battery on their property to bear the entire burden of the "free use" clause, notwithstanding benefits conferred on the other lessors. The record demonstrates the residue gas is used in furtherance of overall lease operations because it is used to fuel equipment which separates the oil, gas and water into separate streams, thereby allowing the Little Knife Gas Plant to process the gas into a marketable product and to recover other products sold at the plant tailgate. Since the residue gas is used in furtherance of the leased operations, we conclude the district court did not err in determining the "free use" clause allowed Petro–Hunt to use the residue gas off of the leased premises to fuel the central tank batteries. We affirm the district court's order granting Petro–Hunt summary judgment on this issue.

### C

### 1

[¶ 28] The Class argues the district court erred as a matter of law when it determined Petro–Hunt's deduction for risk-capital and depreciation were not excessive. The Class contends Petro–Hunt cannot justify a risk-capital charge because no risk exists since the Little Knife Gas Plant has made a profit each year. Petro–Hunt claims the 1983 settlement agreement explicitly states it can charge for risk-capital. In determining Petro–Hunt's risk capital deduction was not excessive, the district court stated, "[I]t is undisputed that [Petro–Hunt has] continued the practice of their predecessors and charged royalty owners 6% on undepreciated investment in the Little Knife Processing Plant. This practice was based on the [1980] tax agreement and [1983] royalty agreement

and has been computed and charged against the amount owed royalty owners as an annual basis ever since [Petro–Hunt] purchased the gas plant." Thus, the district court concluded that the risk-capital charges were "commercially reasonable and allowable as deductions from the sales proceeds received for residue gas and plant products to calculate market value at the well." Normally, whether a charge is commercially reasonable is a question of fact and, therefore, inappropriate for summary judgment. *See In re Estate of Sagmiller*, 2000 ND 151, ¶ 12, 615 N.W.2d 567. However, in this case, whether the risk-capital charge was commercially reasonable was properly decided as a matter of law because the parties stipulated to the facts in the record and requested that the court determine the issue according to their motions for summary judgment.

[¶ 29] The 1983 settlement agreement explicitly states the cost of risk-capital shall be six percent on the undepreciated investment in the Little Knife Gas Plant. The record indicates Petro–Hunt has calculated its risk-capital charge according to the 1983 settlement agreement. The Class fails to explain why the parties to the 1983 settlement agreement are no longer bound by that agreement. The Class also fails to demonstrate why Petro–Hunt's six percent risk-capital charge is excessive. We have stated a party resisting a motion for summary judgment "must set forth specific facts by presenting competent, admissible evidence, whether by affidavit or by directing the court to relevant evidence in the record, demonstrating a genuine issue of material fact." *Buchholz*, 2008 ND 158, ¶ 15, 755 N.W.2d 472. Based on this record, we conclude the district court properly determined Petro–Hunt's risk-capital charge is commercially reasonable and can be deducted from the sales proceeds prior to calculating the Class's royalty. We affirm the district court's order granting Pe-

tro–Hunt summary judgment regarding the risk-capital charge.

### 2

[¶ 30] The Class argues Petro–Hunt's depreciation deduction is excessive because the 1983 settlement agreement prohibits Petro–Hunt from charging depreciation after July 22, 1990 and that Petro–Hunt charged depreciation against the Class through 2007. Petro–Hunt contends the 1983 settlement agreement does not require all depreciation to have occurred before July 22, 1990. The district court determined Petro–Hunt's continued deduction for depreciation was commercially reasonable.

[¶ 31] The 1983 settlement agreement does not state that depreciation must cease after July 22, 1990. Rather the agreement states:

"Depreciation on a 13 year straight line method shall be allowed as an item of expense in accordance with the above referenced agreement. If at the end of thirteen (13) years from plant start-up (July 22, 1990), or when only 10% of the processed gas is being delivered from Little Knife Field, whichever is earlier, casinghead gas produced from the Little Knife Field is still being processed at the Little Knife Plant, the fair market value of the plant facilities shall be compared to the book value ... contained in the agreement with the Tax Commissioner and if the fair market value at said time is greater, royalty shall be paid to the then owners on the difference."

The agreement with the Tax Commissioner referenced in the 1983 depreciation clause states:

"Actual depreciation charges will be based on a schedule using the straight line method over an assumed plant life of 13 years. This 13–year plant life will be subject to review each fiscal year to determine if anything significant has oc-

curred that would warrant a change in the estimated economic life of the plant. If such a change is found to be warranted, the remaining depreciation will be adjusted appropriately."

The plain language of neither the tax agreement nor the 1983 settlement agreement prohibit Petro–Hunt from charging depreciation past July 22, 1990. Rather, the tax agreement requires Petro–Hunt to annually review the economic life of the Little Knife Gas Plant and adjust the depreciation accordingly. The record establishes Petro–Hunt has annually reviewed the economic life of the Little Knife Gas Plant and accordingly adjusted the depreciation deduction. The evidence demonstrates Petro–Hunt has added over $2 million in capital investments into the Little Knife Gas Plant and has adjusted the deprecation based upon the extended economic life of the Little Knife Gas Plant. We conclude the 1983 settlement agreement does not prohibit Petro–Hunt from charging depreciation past July 22, 1990.

[¶ 32] The Class also claims Petro–Hunt has charged excessive depreciation because Petro–Hunt has depreciated the Little Knife Gas Plant below its salvage value. Petro–Hunt claims it has not depreciated the Little Knife Gas Plant below its salvage value because it currently has $656,818 left to depreciate before the Little Knife Gas Plant would be depreciated below its salvage value. At the July 14, 2008 hearing on the motions for summary judgment, both parties agreed the issue regarding the salvage value of the plant could be decided as a matter of law. In granting Petro–Hunt summary judgment, the district court determined the undisputed facts revealed that Petro–Hunt has "not depreciated the Little Knife Gas Plant below the salvage value or deducted depreciation in excess of cost."

[¶ 33] The undisputed facts reveal Petro–Hunt purchased the Little Knife Gas

Plant for $6,213,452. The Class argues Petro–Hunt could not depreciate the Little Knife Gas Plant below $3,341,357, its salvage value. In making that argument, the Class ignored Petro–Hunt's purchase price was net of salvage value because the salvage value had already been deducted from its purchase price. The Class also failed to recognize that since Petro–Hunt purchased the Little Knife Gas Plant, it has made new capital investments to the plant totaling $2,282,415 and that Petro–Hunt can depreciate $2,128,352 of those new capital additions. Thus, Petro–Hunt could depreciate a total of $8,341,804 because the purchase price was $6,213,452 plus the additional capital investments of $2,128,352. The record indicates Petro–Hunt has depreciated $7,684,986, leaving Petro–Hunt a little over $656,000 yet to depreciate. Since the Class failed to dispute these figures, it failed to raise a genuine issue of material fact regarding whether Petro–Hunt has depreciated the Little Knife Gas Plant below its salvage value. Thus, we conclude the district court properly determined Petro–Hunt has not depreciated the Little Knife Gas Plant below its salvage value.

[¶ 34] The Class also contends depreciation should no longer be allowed because the fair market value of the plant exceeds the undepreciated amount. Petro–Hunt argues no competent admissible evidence exists establishing the fair market value of the Little Knife Gas Plant exceeds its book value. The Class's claim that depreciation can no longer be charged once the fair market value of the plant exceeds the undepreciated amount is based upon a provision in the 1983 settlement agreement. The 1983 settlement agreement states:

"If at the end of thirteen (13) years from plant start-up (July 22, 1990), or when only 10% of the processed gas is being delivered from Little Knife Field, whichever is earlier, casinghead gas produced from the Little Knife Field is still being processed at the Little Knife Plant, the fair market value of the plant facilities shall be compared to the book value (original cost plus additional investment less depreciation) contained in the agreement with the Tax Commissioner and if the fair market value at said time is greater, royalty shall be paid to the then owners on the difference."

The district court determined summary judgment was appropriate because the Class failed to present any competent admissible evidence supporting its claim. We have stated a party resisting summary judgment must present competent admissible evidence establishing a genuine issue of material fact and cannot simply rely upon the pleadings or unsupported, conclusory allegations. *Buchholz*, 2008 ND 158, ¶ 15, 755 N.W.2d 472. The Class failed to meet its burden in opposing a summary judgment motion because it did not introduce evidence demonstrating the fair market value of the Little Knife Gas Plant is greater than the book value of the plant. We conclude the district court properly granted Petro–Hunt summary judgment.

### III

[¶ 35] We affirm the district court's order granting Petro–Hunt summary judgment.

[¶ 36] GERALD W. VANDE WALLE, C.J., and MARY MUEHLEN MARING, CAROL RONNING KAPSNER, and DALE V. SANDSTROM, JJ., concur.